**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| In re ALBERT L. FAY, III, and MARIA C. FAY, | ) Case No. 11-61498-LYN |
| Debtors. | ) |
| | ) Adversary No. 11-06067 |
| ALBERT L. FAY, III, and MARIA C. FAY, | ) |
| Plaintiffs, | ) |
| v. | ) |
| STELLARONE BANK, | ) |
| Defendant, | ) |

**MEMORANDUM and ORDER**

This matter comes before the court on a complaint by Albert L. Fay, III, and Maria C. Fay, ("the Debtors") to avoid the lien of StellarOne Bank ("StellarOne"). StellarOne opposes the complaint.

*Jurisdiction*

This Court has jurisdiction over this matter. 28 U.S.C. § 1334(a) & 157(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(A). This Court may enter a final order. This memorandum shall constitute the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, which is made applicable in this proceeding by Fed. R. Bankr. P. 7052.

*Facts*

On June 13, 2011, the Debtors filed a Chapter 13 petition initiating the above-styled

1

bankruptcy case. The Debtor scheduled real property commonly known as 7389 Hidden View Lane, Boston, Culpeper County, Virginia ("the Subject Property"). They scheduled the Subject Property at a fair market value of $303,500.00, based on the 2011 Culpeper County Real Estate Tax Assessment.

The Debtors scheduled a secured claim in favor of Branch Banking & Trust Company ("BB&T") based on a first priority deed of trust against the Real Property. BB&T filed a proof of claim in the amount of $344,522.29. The parties have stipulated that the first deed of trust secures a debt in the amount of $344,542.29 as of the date of petition. The parties have further stipulated that StellarOne holds a second deed of trust in the amount of $97,221.01 that is secured by the Subject Property.

The Debtors filed an adversary complaint seeking to avoid the lien of StellarOne under 11 U.S.C. § 506(d). StellarOne filed an answer asserting preliminarily that the value of the Real Property on the date of petition was $375,000.00.

At the hearing, each party offered an expert witness to opine as to the value of the Subject Property at the time that the Debtors filed their bankruptcy petition. Both experts prepared written reports and those reports were entered into evidence. Each expert gave testimony concerning, and was cross-examined regarding, the appraisal that he had prepared.

The Debtors' expert witness, Alvin Henry, is a Certified Residential Appraiser, licensed by Virginia since 1992 when Virginia began certifying appraisers. Mr. Henry has been involved in Culpeper County real estate market since 1984. He has built about 12 houses there and has owned farms in the county ranging from 30 to 150 acres. He started a bank in Culpeper County and is now on the loan committee of that bank. His firm appraises 75 to 125 properties per year in Culpeper

County.  Mr. Henry appraised the fair market value of the Subject Property at $330,000.00 as of the date of petition.

StellarOne's expert witness, Christian Kaila, is also licensed by the Commonwealth of Virginia.  He has a Masters Degree in real estate from Virginia Commonwealth University and has an SRA designation (residential appraisal) and an MAI designation (commercial appraisal) from the Appraisal Institute.  Mr. Kaila appraised the fair market value of the Subject Property at $395,000.00 as of the date of petition.

*Discussion.*

A Chapter 13 plan may modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence.  11 U.S.C. § 1322(b)(2).  A Chapter 13 debtor may not bifurcate a first priority claim secured by his or her principal residence into a secured and an unsecured claim.  *See Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106 (1993).   A debtor, however, may avoid a wholly unsecured lien on his or her residence of a second deed of trust if the amount of the first deed of trust is greater than the fair market value of the property.

As with any claim to which an objection has been filed, the ultimate burden of proof is on the creditor regarding all matters pertinent to the claim, including the value of any collateral that may secure the claim.  The creditor must prove all contested issues by a preponderance of the evidence.

> The debtor bears the initial burden of proof of overcoming any presumption established by the stated value in the secured creditor's proof of claim. The secured creditor has the ultimate burden of persuasion to demonstrate by a preponderance of the evidence the value of the collateral which secures its claim. *In re Southmark Storage Associates Ltd. Partnership*, 130 B.R. 9, 10 (Bankr. D.Conn.1991).

*In re Serda*, 395 B.R. 450 (Bankr. E.D.Cal. 2008).

Generally speaking the fair market value of real property is established when the price that a buyer would be willing to pay is the same as the price that the seller would be willing to accept.

> Bankruptcy Code section 506(a)(1) instructs that when a court is requested to determine the value of collateral, "such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property ..." 11 U.S.C. § 506(a)(1). When the debtors intend to stay in their house, the proper valuation of the house under Bankruptcy Code section 506(a) is the fair market value. *Taffi v. United States of America (In re Taffi)*, 96 F.3d, 1190, 1192 (9th Cir.1996). The fair market value is not the "replacement" value because the house is not being replaced. Neither is it the "foreclosure" value because no foreclosure is intended in the chapter 13 plan. *Taffi*, 96 F.3d at 1192. The fair market value is "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." *Taffi*, 96 F.3d at 1192.

*In re Flores*, 2012 WL 124973, *3-4 (Bankr. N. D. Cal. 2012).

The Fourth Circuit Court of Appeals adopted this definition when valuing a gas station operation and noted that the process is speculative one, at least to an extent.

> However, fair market value is, by necessity, best set by the market itself. An actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good. Until such an exchange occurs, the market value of an item is necessarily speculative

*Keener v. Exxon Co., USA*, 32 F.3d 127, 132 (4th Cir. 1994).

In another opinion the Fourth Circuit Court of Appeals noted that the valuation of property is not a scientific exercise.

> From the six weeks of testimony in this case, however, certain things became apparent. First, valuation is an art, not a science. It is a function of judgment, not of natural law. Try as it might, even Congress is incapable of enacting either a natural law of the market or Plato's ideal. "True market value", then, must . . . mean something else. Absent a miracle of time, place, and circumstance-willing buyer, willing seller, high noon, January 1, 1984, for example-true market value for the purposes of ad valorem taxation is always an estimate, always an expression of judgment, always a result built on a foundation of suppositions about knowledgeable and willing buyers and sellers endowed with money and desire, whose desires are said to converge in a dollar description of the asset. All of this is simply a sophisticated effort at "lets pretend" or "modeling", in modern jargon, and all of it involves judgment.

*Chesapeake Western Ry. v. Forst,* 938 F.2d 528, 532 (4th Cir. 1991).

The truth of this insightful observation regarding the appraisal process is manifestly demonstrated in the case at bar. Both of the experts are certified by the Commonwealth of Virginia. Both have impressive credentials. Both have experience, having appraised real properties in the area for more than fifteen years. Further, the Court is convinced that each expert applied accepted principles of the appraisal craft in making his appraisal. In spite of these facts, Mr. Henry appraised the Subject Property at $330,000.00 and Mr. Kaila appraised the property for $395,000.00, amounts that are $65,000.00 apart.[1]

As a preliminary matter, StellarOne argues that the Debtors' comparable properties should not be considered because each of the three sales was the result of a bank foreclose. The first and third comparable properties were sold by the bank on the market through a real estate broker and the second comparable property was sold at auction. This is not a reason to discount the Debtor's comparable sales. Mr. Henry testified that approximately fifty percent of the houses on the market in Culpeper County are owned by banks. He further testified that bank sales are the "driving force" in the market and that they "basically determine the prices."[2] If bank sales are the driving force in the market, then they essentially *are* the market. Nor is it relevant that banks might have an incentive to accept a lower price than non-bank owners. If non-bank sellers do not drop their prices to meet those of the banks, then they will never sell their houses. This general proposition is true in any market where almost perfect information is available regarding the nature of the products that

---

[1] An explanation of the difference is found, to some significant extent, by examining the comparable sales that each of the experts selected. Mr. Henry selected three properties that sold for an average price of $290,600.00. Mr. Kaila selected five properties that sold for an average price of $386,800.00.

[2] Transcript of Hearing, p. 29.

5

are for sale.

An examination of the objective[3] features of the properties in each case reveals that the two groups of properties are not very different on the surface. Those characteristics are summarized in the tables below:

**Mr. Henry for the Debtors[4]**

|  | SF | AC. | RM | BR | B | Date | Dist. | Price | Adjust. | Adj. FMV |
|---|---|---|---|---|---|---|---|---|---|---|
| Subj. | 2782 | 10.5 | 9 | 3 | 2.5 |  |  |  |  |  |
| #1 | 2838 | 10.0 | 10 | 5 | 2.5 | 6/11 | 3+ | $286,900 | $33K | $319,949 |
| #2 | 1888 | 10.6 | 7 | 3 | 2.5 | 6/11 | 4+ | $260,000 | $65.5K | $325,500 |
| #3 | 2482 | 10.0 | 9 | 3 | 2.5 | 2/11 | 13+ | $324,900 | $17.2K | $342,097 |
| Avg. |  |  |  |  |  |  |  | $290,600 |  | $330,000 |

**Mr. Kaila for StellarOne**

|  | SF | AC. | RM | BR | B | Date | Dist. | Price | Adjust. | Adj. FMV |
|---|---|---|---|---|---|---|---|---|---|---|
| Subj. | 2782 | 10.5 | 9 | 3 | 2.5 |  |  |  |  |  |
| #1 | 2804 | 10.0 | 10 | 4 | 3.5 | 2/11 | 12.20 | $395,000 | -$ 1,700 | $393,270 |
| #2 | 2788 | 1.19 | 10 | 4 | 2.5 | 6/11 | 6.96 | $395,000 | -$ 9,000 | $404,000 |
| #3 | 3349 | 0.94 | 10 | 4 | 3.5 | 5/11 | 10.06 | $400,000 | -$ 4,355 | $395,645 |
| #4 | 2148 | 8.75 | 9 | 3 | 2.5 | 10/10 | 7.69 | $369,000 | $29,675 | $398,675 |
| #5 | 1926 | 12.7 | 10 | 4 | 2.5 | 8/10 | 4.29 | $375,000 | $25,450 | $400,450 |

---

[3]  The term "objective" in this case is used to mean those descriptive characteristics of a property that are readily quantifiable from a drive by inspection or reference to a property listings data base.

[4]  SF = Square Footage of the property; AC = Acreage; RM = Rooms; BR = Bedrooms; B = Bathrooms; Date = Date of sale of the property; Dist = Distance from the Subject Property to the Comparable Property; Price = Sales price of the comparable property; Adjust. = Total Adjustments based on differences between the Subject Property and the comparable property; and Adj. FMV = Adjusted fair market value of the comparable property.

| Avg. | | | | | | | $386,800 | | $395,000 |
|---|---|---|---|---|---|---|---|---|---|

Six of the eight comparable properties were located on 8.75 - 12.7 acres while the Subject Property was located on 10.5 acres. Three of the comparable properties had three bedrooms and another four had four bedrooms. The Subject Property has three bedrooms above grade and a room in the finished basement that could be used as a fourth bedroom. An analysis of the above charts reveals that most of comparable properties are similar to the Subject Property when the objective characteristics are considered.

Why, then, do the two experts arrive at significantly different fair market values for the same property? The answer must necessarily lie in the difference in the subjective characteristics of the properties. For purposes of this analysis, subjective characteristics include those that are difficult to quantify using the sources employed by the experts. They include such things as the location of the property, the terrain of the acreage, the view from the house, whether the property is wooded, and perhaps most significantly, the improvements and upgrades in the interior of each property.[5][6] The court can think of no other reason for the two experts to reach such different appraisal amounts.

Each expert chose a set of comparable sales that resulted in an average sales price that was relatively close to his final appraisal. It can only be concluded that the properties selected by Mr. Kaila had more desirable subjective characteristics than those selected by Mr. Henry. The issue then becomes, which set of comparable properties best represents the Subject Property.

The court concludes that the comparable properties selected by the Debtors more closely

---

[5] Each expert attempted to include some of these characteristics in his analysis.

[6] This list is not meant to be exhaustive.

7

resemble the Subject Property. First, StellarOne did not make an adjustment to its comparable properties based on the location of the properties within Culpeper County. Four of StellarOne's five properties were closer to Washington, D.C., than the Subject Property, but no adjustment was made on that basis. Mr. Henry testified that the Subject Property is located in the least desirable area of Culpeper County, primarily because it is farther from Washington, D.C., than the rest of the county. Some adjustment should have been made for the location of StellarOne's comparable properties.

Second, the court concludes that the Subject Property, when compared to StellarOne's comparable properties, does not contain upgrades that would warrant a higher valuation. Mrs. Fay, who has sold real estate in the Culpeper area for more than twenty years, testified that the Debtors family is a blended family[7] and that square footage was more important to them than upgrades when they built the home. She testified that they chose the less expensive building materials in their selection of such things as flooring and cabinets.[8] This would partially explain the difference between the two appraisals.

Third, and most important, there are significant reasons to accept the Culpeper County 2011 assessment of $303,500.00 as an accurate *indication* of the fair market value of the Subject Property. The county assessment is the result of a process that has been continuously modified over time with the goal of assessing properties at a value that is close to the market value. The County has assessed a large number of properties over an extended period of time and, no doubt, compared them with actual sales. Houses are assessed and those assessments are adjusted when the house sells or when the price of housing in general increases or decreases. This process results in a continuous

---

[7]  Transcript of hearing, pp. 44 & 50.

[8]  Transcript of hearing, pp. 48.

adjustment to the method of determining the assessment which in turn results in a continuous correction toward the actual market value of each house. While such a process may not be a perfect indicator of the actual fair market value of any particular house, it is a process that should, for most houses, render values that are close to the actual fair market value.

Further, the assessment process is the result of competing economic forces that are not unlike the pricing mechanism that results from the conflicting incentives of sellers and buyers. The first force that is exerted on the "assessment market" is the incentive of each municipality to maximize revenue (as much as is reasonable) in order to fund its budget. This incentive tends to drive up the assessment amount. Further, this incentive is no doubt strong when municipal governments are facing budget problems, such as now. The countervailing force results from the incentive that each homeowner has to monitor and challenge the assessment of his or her home in order to minimize the amount of property taxes that must be paid. Taken together, these two forces keep assessment values from wandering very far from market values.

The foregoing regarding assessed values is not a reason to accept an assessment of a property as its market value without further consideration. It is, however, a reason to include the assessed value as one factor when attempting to determine the fair market value of a property.

### *Conclusion*

The Debtors' assessment of $330,000.00 represents the fair market value of the Subject Property. This amount is less than the amount of the first deed of trust on the Subject Property. Accordingly, the Debtors may avoid the lien of StellarOne Bank.

An appropriate judgment shall issue.

Upon entry of this Memorandum shall forward a copy to John P. Goetz, Esq., Matthew D.

Huebschman, Esq., and the Chapter 13 trustee.

    Entered on this  28th  day of February, 2012.

_____

William E. Anderson
United States Bankruptcy Judge

10